A10A2220. DYE v. MECHANICAL ENTERPRISES, INC.
(708 SE2d 24)

ADAMS, Judge.

Plaintiff/appellant William G. Dye brought suit against his former employer, Mechanical Enterprises, Inc. ("MEI") seeking to recover $127,185.91 in commissions he alleged he was owed pursuant to his contract with MEI and OCGA § 10-1-700 et seq. He also sought attorney fees and expenses of litigation. MEI answered,[1] admitting that Dye had the opportunity while employed there to earn "additional compensation" but denying that any commissions were due and owing to him. Mechanical filed a motion for summary judgment, and the trial court granted the motion following a hearing. Dye appeals.

> Summary judgment is appropriate when no genuine issues of material fact remain and the movant is entitled to judgment as a matter of law. Applying a de novo standard of review, we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Citation and footnote omitted.) *Mathews v. Marietta Toyota*, 270 Ga. App. 337 (606 SE2d 862) (2004).

---

[1] MEI also counterclaimed seeking damages for computer theft, computer trespass and conversion as well as attorney fees and expenses of litigation. MEI dismissed this counterclaim without prejudice after it was granted summary judgment.

Construed in the light most favorable to Dye as the non-movant, the record shows the following pertinent facts: Dye negotiated the terms of his employment with Philip Allgood, the president and CEO of MEI. Pursuant to their negotiations, Allgood sent Dye a letter confirming his compensation as follows: "Due to our current cash flow situation, your starting salary will be $55,000 per year, . . . and a monthly commission on shipped transportation sales in accordance with the MEI Sales Policy." Dye admitted in his deposition that the MEI Sales Policy referenced in the letter "was a policy yet to be written," and that, pursuant to his discussions with Allgood, the intent was to write a policy that provided more consistency concerning how commissions were computed for sales representatives.

Dye further testified that pursuant to the letter and the parties' oral negotiations prior to his employment, the term "*shipped* transportation sales" referred to "any product shipped by MEI for use in transportation" and that his commissions were due at the time the product was delivered to the customer, not the time payment was received from the customer, as was the practice for other sales representatives. He said this was an incentive Allgood offered to ensure that Dye was paid more than the $55,000 salary. He also testified that he was entitled to commissions for *all* transportation sales that were shipped, whether he generated the sale or not. Additionally, he testified that he and Allgood orally agreed his commission rate would be five percent, and that there was a history at MEI of paying sales representatives five percent commissions, although he also admitted that not all salespersons were paid at that rate. And as further evidence of his five percent commission rate, he also introduced a handwritten note made during a telephone conversation he had with Allgood prior to his employment which contains the notation "5% first year," as well as documents he contends showed a five percent commission was automatically entered when estimating pricing. Dye testified that while he was entitled to be paid the commissions he had earned on a monthly basis, he never submitted a request for payment while he was employed at MEI because the company was barely making payroll and he was paying expenses out of his own pocket. He also testified that he and Allgood discussed the fact that he would defer his commissions prior to his coming to work at MEI, and that after he came to work at the company Allgood "continuously" reminded him that he had commissions coming because Allgood was concerned that he would leave the company.

Allgood testified that Dye was hired as Vice President of Sales of MEI, and that he was hired to bring in new accounts and new products as well as overseeing the other sales representatives. Allgood testified that the letter reflected the terms under which Dye

was hired, including their agreement concerning sales commissions, which was to be in accordance with MEI Sales Policy. As to that policy, Allgood testified that in early June, several months before Dye was hired, the company had decided to standardize the commission agreements for all sales representatives hired after that date because the varying commissions agreements with different sales representatives had become a management problem. He testified that at the time Dye was hired, this sales "policy" was in writing but only in outline form and that he told Dye that one of his first duties would be to put the outline into a formal written policy. He said that under that sales policy, a salesperson would be paid a ten percent commission on any new products[2] for the first year, five percent on existing sales for the second year, and three percent "retainage" on mature sales. He said the policy was meant to be a "driver" for new sales. However, Allgood acknowledged that even after the uniform sales policy was instituted, certain employees negotiated separate agreements and were not paid in accordance with that policy. The evidence further shows that following his termination, Allgood sent Dye a letter clarifying his position; in that letter he stated, inter alia, that when Dye was hired, it was under a salary "cap" of $55,000 in effect at that time, "plus a commission on new sales." The letter further stated that Dye was entitled to commissions on two new accounts, but at the rate of 1.5 percent instead of 5 percent because those sales were to distributors at significantly reduced prices, and that it had never been MEI's policy to pay a five percent commission on sales to distributors.

Based on the foregoing and other evidence of record, it appears undisputed in this case that the parties intended for Dye to be paid a commission. The question then is whether, as MEI contends, that agreement was unenforceable because the letter setting forth the terms of employment did not contain a formula to compute the commission.

In support of its argument that the agreement here was unenforceable, MEI relies on *Arby's, Inc. v. Cooper*, 265 Ga. 240, 241 (454 SE2d 488) (1995), and like cases, which state the general rule that "[t]o be enforceable, a promise of future compensation must be made at the beginning of the employment. . . . However, the promise of future compensation must *also* be for an exact amount or based upon a formula or method for determining the exact amount of the bonus." (Citation and punctuation omitted; emphasis in original.) Thus, in *Arby's*, we held that promise to pay an annual bonus that

---

[2] He clarified that a "new" product included a product sold to an existing customer that had never purchased that product before.

was based partly on a formula and partly in the discretion of the employer was unenforceable. Id. However, in this case, it appears to us that there was no element of discretion concerning whether Dye would be paid a commission. Further, it appears to us that the only dispute here concerns how those commissions would be computed, and that the evidence was in conflict concerning how the parties agreed the commission would be calculated under the terms of the agreement.

> The test of an enforceable contract is whether it is expressed in language sufficiently plain and explicit to convey what the parties agreed upon. Moreover, it is unnecessary that a contract state definitively and specifically all facts in detail to which the parties may be agreeing, but as to such matters, it will be sufficiently definite and certain if it contains matters which will enable the courts, under proper rules of construction, to ascertain the terms and conditions on which the parties intended to bind themselves. (Citations and punctuation omitted.) *Pacrim Assoc. v. Turner Home Entertainment*, 235 Ga. App. 761, 764 (1) (510 SE2d 52) (1998). "The cardinal rule of contract construction is to ascertain the intention of the parties." . . . *Sharple v. AirTouch Cellular of Georgia*, 250 Ga. App. 216, 218 (551 SE2d 87) (2001). Thus, where a contract is ambiguous, "parol evidence may be offered to show the intent of the parties" (*Touche Ross & Co. v. DASD Corp.*, 162 Ga. App. 438, 439 (1) (292 SE2d 84) (1982)), and the question of what the parties intended becomes a factual issue for the jury. *Jones v. Hill*, 246 Ga. App. 194, 196 (539 SE2d 893) (2000). This rule reflects the "well settled . . . policy of the law . . . against the destruction of contracts on the ground of uncertainty if it is possible in the light of the circumstances under which the contract was made to determine the reasonable intention of the parties." (Citations and punctuation omitted.) *McLean v. Continental Wingate Co.*, 212 Ga. App. 356, 358 (1) (442 SE2d 276) (1994).

*Kerwood v. Dinero Solutions, LLC*, 292 Ga. App. 742, 745 (666 SE2d 40) (2008).

In this case, the evidence and all reasonable inferences showed that the parties agreed Dye would be paid a commission and that an agreement was reached as to how that commission would be computed. The fact that the evidence concerning the method they agreed upon is conflicting did not render the agreement unenforceable, but instead required that this issue be submitted to a jury for resolution.

The trial court's order granting summary judgment to MEI is accordingly reversed. Id. at 745-746 (summary judgment not proper although variable compensation clause in a contract did not contain a set formula, employee testified that an attachment to the contract contained the calculation method and parties' past dealings tended to prove they understood how to compute the percentage of profits the employee was entitled to for his services); *Danfair Properties, Inc. v. Bowen*, 222 Ga. App. 425, 426 (474 SE2d 295) (1996) (motion for directed verdict properly denied because fact that the employer contested whether there was a meeting of the minds on the terms of the bonus under an oral contract required that the issue be presented to the jury); *McLean v. Continental Wingate Co.*, 212 Ga. App. 356, 358 (1) (442 SE2d 276) (1994) (noting that it is not necessary for a contract to state all details of the agreement and that agreement to pay particular percentage of net profits is enforceable even though contract did not state method of calculating those profits when parties' past dealing established the method to be used); see also *Moreland v. Traffic Masters*, 225 Ga. App. 244, 246 (483 SE2d 368) (1997) (conflicting evidence as to whether employee under oral employment agreement had earned a certain commission precluded summary judgment). Cf. *Mathews v. Marietta Toyota*, 270 Ga. App. at 340 (promise to pay "fair" bonus unenforceable); *Edwards v. Central Georgia HHS*, 253 Ga. App. 304, 306 (558 SE2d 815) (2002) (undisputed evidence shows definite method for calculating bonus was never established); *Moore v. BellSouth Mobility*, 243 Ga. App. 674, 676 (1) (534 SE2d 133) (2000) (oral promise to promote not enforceable by an at-will employee).

*Judgment reversed. Smith, P. J., and Mikell, J., concur.*

DECIDED MARCH 9, 2011 —

*Strickland, Brockington & Lewis, Mary M. Brockington, Jonathan R. Poole*, for appellant.

*Moorman & Pieschel, Christopher G. Moorman*, for appellee.